Elizabeth A. Mitchell et al. [1] v. Commissioner. Mitchell v. Commissioner
Docket Nos. 48897-48899, 61538.
United States Tax Court
T.C. Memo 1959-49; 1959 Tax Ct. Memo LEXIS 199; 18 T.C.M. (CCH) 227; T.C.M. (RIA) 59049; March 12, 1959
Tad R. Smith, Esq., First National Building, El Paso, Tex., and V. Randolph Delk, Esq., for the petitioners. John P. Higgins, Esq., and Harold Friedman, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income taxes and additions to tax in the years and in the amounts as follows: Additions to Tax [2]
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Elizabeth A. Mitchell - Docket No. 48897
1946
$22,798.21
0
$2,298.01
$1,386.08
1947
12,010.95
0
0
735.12
Estate of Bayne F. Mitchell, deceased, Elizabeth A. Mitchell, Executrix, and
Elizabeth A. Mitchell, individually, Docket No. 48898
1948
$48,918.38
$24,459.19
$5,186.67
$3,229.93
Estate of Bayne F. Mitchell (Deceased)
Elizabeth A. Mitchell, Executrix, Docket No. 48899
1946
$19,926.56
$ 9,963.28
$2,069.79
$1,272.71
1947
12,159.20
6,079.60
0
753.65
Benjamin Duval Donaldson and
Ada Frances Donaldson, Docket No. 61538
1945
$88,258.41
$44,129.21
$8,089.58
$5,405.24
1946
60,652.32
30,326.16
5,547.74
3,698.50
1947
34,980.14
17,490.07
3,330.47
2,220.31
1948
44,963.76
22,481.88
4,255.25
2,836.84
*200 The issues are: (1) Whether Benjamin Duval Donaldson and Ada Frances Donaldson omitted from their tax return for the year 1945 income received from the sale of lumber; (2) Whether the collection of the proposed deficiency for the year 1945 in the case of Benjamin Duval Donaldson and Ada Frances Donaldson is barred by the statute of limitations; (3) Whether petitioners Donaldson and Mitchell omitted from their income tax returns for the taxable years 1946, 1947, and 1948 profits from the operation of a partnership engaged in the purchase and sale of lumber; (4) Whether any of the alleged deficiencies are due to fraud with intent to evade tax; and (5) Whether petitioners are liable for additions to tax pursuant to sections 294 (d)(1)(A) and 294(d)(2). Findings of Fact Petitioners Benjamin Duval Donaldson (hereinafter referred to as Donaldson), and Ada Frances Donaldson are husband and wife and reside in El Paso, Texas. They filed joint individual income tax returns for the years 1945, 1946, 1947, and 1948 with the collector of internal revenue for the first district of Texas, at Austin, Texas. *201 Bayne F. Mitchell (hereinafter referred to as Mitchell and whose estate is one of the petitioners), and Elizabeth A. Mitchell were husband and wife and resided in El Paso, Texas. They filed separate individual income tax returns from the taxable years 1946 and 1947 and a joint individual income tax return for the taxable year 1948 with the collector of internal revenue for the first district of Texas at Austin, Texas. Petitioner Elizabeth A. Mitchell is the widow of Bayne F. Mitchell and the duly qualified executrix of his estate. She presently resides in El Paso, Texas. Emil K. Michner (hereinafter referred to as Michner), is a resident of Mexico City, was born in Austria and is an Austrian citizen. He has been a resident of Mexico for the past 30 years. During World War II, he was employed by the United States Board of Economic Warfare (hereinafter referred to as the BEW), at the American Embassy in Mexico City. The BEW was a procurement agency for the United States war effort. Michner was chief of the Forest Section of BEW in Mexico in charge of procuring mahogany and pine lumber. He secured permits for the export of lumber from Mexico to the United States through contacts with *202 the Mexican Forestry Department, the Export Control Department of the Ministry of Economy, and the control office of the Ministry of Finance, all agencies of the Mexican Government. As a result of his work with the BEW, and particularly of the weekly board meetings with the personnel of the Forestry Department, Export Control Department, and the Ministry of Finance, Michner became well acquainted with the men who controlled the issuance of export permits. In the summer of 1944, Michner left the BEW and went to work for a short period with the Industria Forestal de Jalisco, S. A., a Mexican timber corporation. At this same time, he began the organization of an export-import company which finally developed into the United Export-Import Company, S.A., (hereinafter referred to as United, S.A.). His first step in organizing United, S.A., was to contact the various Mexican Government officials in charge of export permits. Michner contacted Licenciado (Attorney) Silverstre Aguilar, Director General of the Mexican Forestry Service, who reviewed permit applications from a conservation point of view; Raul Serano, Director of Export-Import Controls of the Ministry of Economy, who, after receiving *203 clearance from the Forestry Department, reviewed permit applications from the standpoint of Mexican domestic requirements; and, finally, Licenciado Araujo Nunez of the Ministry of Finance, whose responsibility was the actual delivery of the permit to the border customs house. The most important of these individuals was Raul Serano. Michner himself did not have the means to finance the business. Through Raul Serano, he contacted Colonel Carlos Serano, Raul's uncle and head or president of the Mexican Senate. Carlos Serano, as head of the Senate, was the right-hand man to the President of Mexico and an influential political figure in Mexico. His position was very powerful and his participation in the formation and operation of United, S.A., was a guarantee against interference. Michner understood that Carlos Serano provided the financing of the company. The contact with Carlos Serano, as well as the contacts established by Michner with the officials of the various responsible agencies of the Mexican Government, as set forth above, assured United, S.A., of preferential treatment in the issuance of export permits. United Export-Import Company, S.A., was incorporated under the laws *204 of Mexico on January 10, 1945, as a mercantile corporation with principal office in Mexico City. As translated from the original Spanish, the Articles of Incorporation provided, in part, as follows: "Fourth. - Its object shall be the business of exportation and importation of all sorts of merchandise and in business of any kind in connection with the above stated object. "Fifth. - The capital stock shall be the sum of TWENTY-FIVE THOUSAND PESOS, represented by two hundred and fifty shares, fully subscribed and paid up, of a face value of One hundred Pesos each. "Sixth. - Shares shall be to bearer and shall be signed by the Company's organ of administration; they shall confer upon its holders equal rights and obligations, inasmuch as the founders of the Company hereby declare that they do not reserve to themselves privileges of any sort what-soever; the shares shall contain such transcriptions as are required according to Article One hundred and twenty-five of the Law of Mercantile Companies. "Seventh. - The company shall be managed and administered by one or several Directors elected by General Meeting who shall hold office for an indefinite period, until the General Meeting *205 expressly removes them from their position and the newly appointed ones qualify as such. * * *
"Tenth. - The manager or the Board of Directors shall have full powers of ownership, administration and for lawsuits and collections, whether general or such special powers as may require a special clause under the law, to subscribe credit certificates and to grant all kinds of powers of attorney. * * *
"Nineteenth. - At the end of every fiscal year a General Balance Sheet shall be prepared and any profits obtained shall be distributed as follows: "I. A five per cent thereof shall be set aside to make up, or rebuild on occasion, the RESERVE FUND, until this may reach a sum equal to twenty-five per cent of the capital stock. "II. The remainder, as well as any losses - on occasion - shall be distributed share and share alike among all the shares constituting the capital stock. * * *
First Transitory Clause "The capital stock has been fully subscribed and paid up by the parties appearing herein, in the following proportions: Luis Vera Medel: two hundred and forty-six shares; one share each of the following persons: Carlos Rivero, Manuel Obregon, Jesus Mejia and Roberto *206 L. Palacios. "(Sheet #3) 3. - "The total value of these shares, that is, the sum of TWENTY-FIVE THOUSAND PESOS cash, remains in the Company's possession. Second Transitory Clause Mr. Carlos Rivero is hereby appointed Manager, Sole Administrator of the Company, who shall have all the powers mentioned in Clause Tenth hereof. Mr. Luis Vera Medel is hereby appointed as Supervisor. Both the said officers give security for their handling of affairs by depositing with the Company the value of one share each. "Personal Particulars: The appearing parties are all Mexican citizens, born of Mexican parents by birth and have paid their Income Tax up to date." On January 18, 1945, Carlos Rivero, in his capacity as manager and sole administrator of United, S.A., granted to Michner the fullest power of attorney, with all general powers and special powers requiring special clause under Mexican law, for suits and collections, acts of administration and of dominion, to subscribe instruments of credit and to grant all manner of powers of attorney. Once Michner had secured assurance of preferential treatment in the issuance of export permits, thus giving United, S.A., a virtual monopoly on *207 lumber exports, he contacted ten or twelve of the men who had been working under his supervision with the BEW. Among these men were Edward Williamson, Charles Westerman, Donaldson, Mitchell, and a man named Ffrench. Mitchell had worked for the War Production Board in Washington, D.C., during the early part of World War II. He went to work for the BEW in 1943 and was sent to Mexico as Lumber Procurement Officer, with the duties of signing contracts and expediting the purchase and delivery of lumber to the United States Government in the United States. He left the Foreign Economic Administration in the summer of 1944 and went to work for the Fomento Industrial de Jalisco., S.A., in Guadalajara, Jalisco, Mexico. When Michner contacted him about United, S.A., Mitchell agreed to work for United, S.A., after he terminated his employment with Fomento Industrial de Jalisco, S.A. Donaldson had been sent to Mexico by the BEW subsequent to the time Mitchell arrived there, and took the positions of Lumber Procurement Officer and Chief Lumber Inspector, in which capacities he came to know the lumber producers in northern Mexico. When the Government lumber purchasing program ended in late 1944, *208 Donaldson terminated his employment with the Foreign Economic Administration and went to work for himself, exporting lumber at the border at El Paso for a few weeks in December 1944. During this period, he maintained simple records with a single book covering the shipper, purchaser, shipment, date, railroad car number used for the transportation, cost and selling prices, and payment dates. His personal bank account at El Paso was used for transferring the funds between purchaser and shipper. His profits were reflected in the record book. His 1944 profits were taken into income and reported in his income tax return for that year. When he accepted the position with United, S.A., he continued to use the same book as a record for the lumber shipped under the United, S.A., permits. A personal bank account at the Laredo National Bank was used for depositing receipts from sales, and for payment to the producer for the shipment. His use of the same book and his personal bank account was a matter of convenience until United, S.A., established an office in El Paso and Ciudad Juarez, Mexico. In 1944 Michner met Donaldson, Mitchell, and another man named Palmer Coward in Monterrey, Mexico, at *209 which time he discussed with them the prospects of United, S.A., and asked them to come with that organization. All agreed to enter into employment of United, S.A. No arrangement was made with them regarding profit sharing or ownership of the business. Michner did not inform them of the ownership of the corporation, or that Carlos Serano was the individual responsible for its financing, since that was known only by himself and Raul Serano. United, S.A., was divided into pine, mahogany, and miscellaneous products departments. The pine department was again divided into the Chihuahua division, at Juarez-El Paso, in the charge of Donaldson and Mitchell; the Durango division, in the charge of Contreras; the western Mexico division, in the charge of Ffrench; and another pine division at Oaxaca. The mahogany department was divided into the southern Mexico operation, located principally at Campeche, in the charge of E. H. Williamson, and the Quintana Roo division, in the charge of Westerman. The miscellaneous products department included mainly fertilizer, feed and peanuts. The points of export used by United, S.A., were: for pine and secondary hardwoods, Juarez-El Paso, Manzillo, [3] Laredo, *210 and Piedras Negras; for mahogany, Coatzacoalcos and Campeche, Mexico, and Belize, British Honduras. Donaldson began his employment for United, S.A., early in 1945. Because no office had been established as yet in the Juarez-El Paso division, he did not open a special office, but rather obtained a desk in the office of S.D. Taylor, customs broker, at 450 Canal Street, El Paso, Texas. The Juarez address was at the office of Manuel Villegas Lopez, a Mexican customs broker; however, this was not used by Donaldson until early in 1946. Shipments, orders, and payments were made to Donaldson personally and as agent for United, S.A. Correspondence with respect to these transactions, to purchasers, to the Mexico City office of United, S.A., and to suppliers followed the same form. Some were addressed to Donaldson personally, some were addressed to United, S.A., Ben Donaldson, agent, and in some cases Donaldson simply received copies of the correspondence between United, S.A., and the third parties. All lumber exported through the Juarez-El Paso office was accomplished through United, S.A. *211 , exports permits. Export permits were issued by the Mexican ministery and sent directly by it to the Mexican customs official at the point of export. Notification of the permit and the amount of lumber to be shipped under that permit were also mailed by the ministry to United, S.A., in Mexico City. United, S.A., forwarded this information to its exporting agent at the point of export. When the lumber was shipped, United, S.A., was required to inform the Mexican officials of the railroad car number, amount of lumber shipped in each car, and the number of the permit under which it was shipped. The agent of United, S.A., also received listings of the cars and shipments from the Mexico City office. The agent then notified the appropriate Mexican official and the Mexico City office of United, S.A., once the cars had cleared the customs office at the point of export. The records maintained by Donaldson as agent, and later by the bookkeeper at Juarez, correspond in every instance with the United, S.A., shipments out of Juarez. United, S.A., was able to avoid delays and extra handling by the Mexican outlets of United States manufacturers through use of the El Paso office and by taking *212 delivery there of machinery acquired from United States sources. Payment was made from Donaldson's account in either El Paso or Laredo. Since the central office in Mexico City handled the bookkeeping records for Donaldson's operations, aside from his personal records and accounts, Donaldson wrote checks payable to Michner or United, S.A., and forwarded them to Mexico City. The balances in the profit and loss accounts on the books in Mexico City reflected the status of the business in El Paso. On December 5, 1945, United, S.A., opened a bank account either in Juarez or El Paso available for use in handling the lumber exports and shortly thereafter offices were opened in both cities. All bookkeeping with respect to Donaldson's activity previously handled in Mexico City was transferred to the new Juarez office under instructions of Vera Medel, the comptroller in charge of the Mexico City office. The bookkeeper in Juarez for United, S.A., was J. J. Guerra. Early in 1946, Vera Medel made a visit to the Juarez office to set up the bookkeeping system and procedures. Thereafter, Vera Medel, who received his instructions from Raul Serano, sent directions to Guerra as to bookkeeping and office *213 procedures from the Mexico City office. On April 27, 1946, Michner, as attorney for United, S.A., granted a general power of attorney to Donaldson similar to the power of attorney that had been issued to him on January 18, 1945. All correspondence with the Juarez office was in the name of United, S.A. When Donaldson acquired equipment from United States suppliers or manufacturers for United, S.A., the invoices and correspondence were directed to United, S.A. Experts were paid for out of the Juarez-El Paso bank account, and receipts deposited there by purchasers. In 1946, Donaldson signed a financial statement for the purpose of establishing commercial credit which was filed with the El Paso National Bank. Under "current assets" was listed $10,000 as representing a 25 per cent interest in "United Exp. Imp. Co.," a reference to United, S.A. The entries on the statement, other than his signature, were not made by Donaldson personally. In 1948, Coward, Michner, Donaldson, and Mitchell, incorporated United Export-Import Co., Inc., under the laws of Texas. The paid-in capital was $2,000. The bookkeeper of the Juarez office made out monthly statements as directed by Vera Medel from *214 Mexico City. Each month the profit and loss account was charged with expenses, credited with income, and at the end of the month the profit was allocated between Donaldson, Michner, Mitchell, and Coward. This allocation was made without their knowledge. The allocation was done to disguise the actual ownership of United, S.A., and to prevent political difficulties for the real stockholders. The moneys so allocated on the books were never distributed in fact to the parties named. On one occasion Coward, Mitchell, and Michner wrote checks on the company account in amounts in excess of their salaries, but on that occasion Vera Medel complained to each of them of their withdrawals and the money was redeposited by Mitchell and Michner. Coward claimed the money was owed him for expenses and salary and refused to redeposit the withdrawn amount. There was no other occasion on which any of these individuals or Donaldson, withdrew sums other than their salaries and expenses. When the bookkeeping allocation became known by Michner, he complained to Vera Medel and the Juarez bookkeeper with the result that allocations were thereafter recorded to A, B, C, and D. The profits of the Juarez-El Paso *215 office of United Export-Import Company, S.A., were used to establish a processing, manufacturing and milling plant. To this end, United, S.A., established a plant in Juarez, which was known as the Juarez mill of Ponderosa, S.A., which had been incorporated as a Mexican mercantile corporation on November 27, 1945. The Articles of Incorporation provided, in part, as follows: "FIRST: - The society shall be called 'PONDEROSA', S.A. "SECOND: - Its address shall be Ciudad Juarez, Chihuahua, without preventing it from establishing branches or agencies in any other place. * * *
"FOURTH: - Its object shall be the installation of plants working in the manufacture of lumber products, sawmills, industry and commerce of lumber and in general any business that may be related with this subject. "FIFTH: - The social capital is TWO HUNDRED AND FIFTY THOUSAND PESOS, represented by two hundred and fifty shares to the bearer, with a nominal value of one thousand pesos each completely undersigned and paid. * * *
"SEVENTH: - The society will be governed and administered by one or more Directors elected by the General Assembly, who shall remain in office indefinitely, until the Assembly *216 expressly relieves them of their charge and the newly elected take possession of their positions. "EIGHTH: - In order to take possession of their posts, the Directors shall deposit in the company's safe, the amount named by the same Assembly as a guarantee of management. * * *
"NINETEENTH: - At the end of each fiscal year, a general balance shall be drawn up, and the profits obtained shall be distributed in the following manner: I. - At lease five per cent shall be put aside, to make up or rebuild as the case may be, RESERVE FUNDS, until this amount equals a fifth part of the society's capital. II. - The remuneration of the Board Members and the Commissar, and III. - The rest, as well as the losses in such case, shall be equally distributed, among all the shareholders. * * *
"FIRST TRANSITORY: - The Social Capital is completely undersigned and paid for by those present, each one of them subscribing for fifty shares, that is to say the amount of two hundred and fifty thousand pesos, - is shown in this deed in cash and in the possession of the society. "SECOND TRANSITORY: - The First Board of Directors is made up in the following manner: PRESIDENT - Mr. Rafael Alcerreca. *217 - TREASURER: Miss Celina Martinez del Valle. - SECRETARY: Mr. Arturo Gonzales. - CHAIRMAN: Mr. Ricardo Erosa Troya. - COMMISSAR: - Mr. Luis Vera Medel. - These officers have taken charge of their posts, depositing in the society, the value of one share each. * * *
"GENERAL DATE: - Those appearing are Mexicans by birth, and offspring of Mexican parents, and have paid their Income Tax. - Mr. Vera Medel, married, manufacturer, fifty five years of age, lives at Avenida Revolucion number three hundred and ninety six. - Mr. Alcerreca is an attorney, married, thirty one years of age, residing at number twenty two Guadiana Street. - Miss Martinez del Valle, single, twenty four years of age, resides at number thirty two Abraham Gonzalez Street. - Mr. Arturo Gonzales, civil engineer, single, forty one years of age, resides on Puerto Real Street number four. - Mr. Erosa, married, manufacturer, aged twenty seven, resides on Avenida Revolucion number three hundred and ninety six." Ponderosa, S.A., began operations early in 1946. The directors were Coward, Donaldson, and Michner. On January 15, 1947, Rafael Alcerreca, representing Ponderosa, S.A., as its attorney, conferred upon Michner *218 a general power of attorney similar to that executed in Michner's favor for United, S.A. In the same grant of power of attorney in favor of Michner, the corporation granted powers of attorney for administration, suits and collections in favor of Donaldson and Mitchell. Ponderosa, S.A., started operating with a small plant and then built a large plant from the profits of United, S.A., which became the largest lumber manufacturing plant at that time in Mexico. It was able to handle up to 80 per cent of the lumber exported from Mexico with a working force of 450 men working two or three eight hour shifts daily six days per week. The bookkeeping operations of Ponderosa, S.A., were performed by Jose J. Guerra, under directions from Vera Medel, the comptroller of United, S.A. The Mexico City records of United, S.A., were transferred to the Ponderosa, S.A., plant. Early in 1949 the Ponderosa, S.A., plant in Juarez burned with the complete destruction of records and resulting in the liquidation of Ponderosa, S.A., and United, S.A. Michner was appointed the administrator in handling the liquidation. Donaldson's and Mitchell's income tax returns, including the separate returns filed in some *219 instances by Mitchell's wife, reported salary payments from United, S.A., exclusive of commissions and bonuses, as follows: Year
Donaldson
Mitchell
1945
$12,000
0
1946
12,000
$ 8,000
1947
18,000
7,500
1948
18,000
15,000
Ponderosa, S.A., and United, S.A., have never declared or paid dividends. Donaldson and Mitchell did not attend stockholders' meetings for either United, S.A., or Ponderosa, S.A. Neither did they vote any shares at the meeting by proxy. They did not own any stock in either United, S.A., or Ponderosa, S.A. Donaldson did not realize income from the transactions he conducted during 1945 on behalf of United, S.A., in addition to his salary. His return for 1945 was not false or fraudulent with intent to evade tax. Neither Donaldson nor Mitchell realized income from any lumber exporting partnership during the years 1946, 1947, or 1948, nor did they realize any income during those years, other than salary, from the lumber business. None of the alleged deficiencies in Federal income taxes for any of the calendar years 1945 through 1948 were due to fraud with intent to evade the tax. Petitioners are not liable for the additions to the *220 tax under section 293(b). A consent fixing the period of limitation upon the assessment of income tax for the taxable year ended December 31, 1945, was signed by Donaldson on or about December 15, 1950, and consecutive timely extensions were filed effective to June 30, 1956. The deficiency notice determining the deficiency in Donaldson's 1945 income tax was mailed on December 29, 1955. Petitioners are liable for the additions to the tax under sections 294(d)(1)(A) and (d)(2). Opinion The disposition of issue (1) depends on whether Donaldson was engaged as an agent for United, S.A., during most of 1945 or whether, in reality, he was continuing during that period to operate the business he had conducted in the last month of 1944 as a sole proprietor. When respondent audited Donaldson's return for 1945, he also made an audit of Donaldson's bank account and personal record book which Donaldson maintained for that same year. The record book indicated that certain railroad cars of lumber had been shipped out of Mexico, the cost of the lumber, and the sales price. As we have found, Donaldson used his own bank account to handle these transactions and that account showed the debits *221 and credits arising therefrom. Primarily from this circumstance, respondent concluded that Donaldson actually had continued to operate his own exporting business throughout most of 1945. The respondent found further support for this conclusion in the granting of a power of attorney to Donaldson late in 1945, the opening of a new bank account for United, S.A., at approximately the same time, and the entry in Donaldson's personal record book indicating a change to United, S.A.'s account. While these facts taken alone might well give the appearance that Donaldson actually had continued to operate his own exporting business during most of 1945, other significant evidence strongly supports a contrary conclusion. Donaldson's records listed shipments of lumber under specific railroad car numbers. Those car numbers correspond exactly in all cases with the car numbers of shipments made under export permits issued to United, S.A., itself. Moreover, while some of the correspondence relative to these shipments was addressed to Donaldson personally, much of it was addressed to him as agent for United, S.A., during this same period. Some of the correspondence and invoices relative to the same *222 single shipment of lumber were in both forms. In some cases Donaldson merely received copies of the orders and invoices which were sent to or from the Mexico City office of United, S.A. United, S.A., was actually operating in several divisions, only one of which was the Juarez-El Paso office where Donaldson was engaged. While Donaldson continued use of his own personal bank account for a time, he did not withdraw any of the funds in the bank account for his own benefit, other than his salary payments. In addition, during the very portion of 1945 when the respondent claims he was still operating his own business, he withdrew sums from that account and forwarded them to the Mexico City office of United, S.A. In our opinion, these transfers of funds to the Mexico City office reflected a transfer of profits from the Juarez-El Paso division of United, S.A. These withdrawals apparently were not considered by respondent when the account was audited. Insofar as the creation of the bank account for United, S.A., in the latter part of 1945 and the granting of the power of attorney to Donaldson at approximately the same time are concerned, these events simply coincided with the establishment *223 of the United, S.A., offices in Juarez-El Paso. Similarly, the notation in Donaldson's personal record book indicating a change to the account of United, S.A., merely coincided with the creation of the latter account. A disinterested witness corroborated Donaldson's testimony to the effect that he was in fact an agent for United, S.A., during all but a few weeks of 1945. In light of all the evidence, we have found that Donaldson did not realize income from a business which he conducted for himself in 1945 and that he was in fact an agent for United, S.A., during the major portion of that year. Therefore, the funds in his bank account were not his personally, but belonged to United, S.A. Four years subsequent to the filing of his 1945 income tax return, Donaldson signed a consent extending the period for assessment and subsequent consents extending the period to June 30, 1956. The deficiency notice was mailed on December 29, 1955. Petitioners assert that the first consent was without effect since it was signed subsequent to the running of the statute of limitations, citing , affd. (C.A. 6, 1944). Respondent argues *224 that petitioners had omitted income in excess of 25 per cent of that shown on the return and under section 276(c) he had five years in which to assess the tax. Respondent's position depends on our finding as to the first issue that Donaldson was operating his own business during 1945 and had realized income from that business which he did not report. Since we have found that Donaldson did not realize income in 1945 which he failed to report, the findings precludes any decision for respondent as to this issue. The five year period for the assessment of deficiency in section 276(c) is not applicable to the year 1945. Respondent determined initially that Donaldson and Mitchell were operating a disguised partnership during 1946, 1947, and 1948. Subsequent to the deficiency notice, respondent took the position that the individuals concerned were owners of the corporation United, S.A., and had received distributions of dividends, either constructively or actually. The main evidence to substantiate this position was the general ledger and journal book of the Juarez-El Paso office. As we have found, the profits of the operation were the subject for a time of a book allocation each month *225 among Donaldson, Coward, Michner, and Mitchell. However, there was no evidence that these amounts ultimately were distributed to the petitioners. No dividends were ever declared by United, S.A., or Ponderosa, S.A. On the one occasion that the distribution allocated on the books was drawn against by any of the individuals concerned, they were ordered to return the withdrawal, which they did except for Coward. There is no evidence of stock ownership in the hands of Donaldson or Mitchell. They registered no proxy votes at the stockholders' meetings. There are no records to show that the petitioners ever received distributions from United, S.A., other than their reported salaries. The respondent further urges that if no partnership existed and if the petitioners were not stockholders of United, S.A., then they actually operated the Juarez-El Paso office as a separate business, that is separate from United, S.A., and that they were the owners of this business. However, what records are available would all indicate that the entire operation was in fact part of United, S.A., that any profits inured to United, S.A., and not to petitioners. There is no indication that petitioners ever received *226 more than their reported salaries, including commissions and bonuses, as agents for United, S.A. All profits were used in the establishment of the Ponderosa, S.A., manufacturing plant in Juarez. Correspondence, invoices, and orders indicate that purchasers of lumber in the United States understood that they were acquiring the lumber from United, S.A., not from the agents Donaldson, Mitchell, Coward, or Michner. We are satisfied from the testimony that the financial statement filed by Donaldson with the El Paso National Bank was submitted in reality for the purpose of securing credit on behalf of United, S.A., although so far as we know, no credit was ever actually extended on the basis of the statement. We are satisfied from all the evidence that the statement thereon to the effect that Donaldson possessed 25 per cent ownership in "United Exp. Imp. Co." was simply not true as meaning ownership in United, S.A. Donaldson had no ownership interest in United, S.A. The respondent's various determinations discussed above are based essentially upon certain superficial indicia appearing upon the books and records of United, S.A., and upon the bank account and personal record of Donaldson. *227 Concededly, these appearances are not inconsistent with the conclusions upon which the respondent based his determinations. On the other hand, these same appearances are also consistent with the conclusions argued for by petitioners, namely, that the continued use of a personal bank account and book by Donaldson was a matter of convenience and that the book allocations for the benefit of petitioners were due to the exigencies of doing business in Mexico, serving to hide the true ownership of the business. Moreover, as we have seen, there is considerable evidence which affirmatively supports the petitioners' story. In the latter connection, the testimony of Donaldson was corroborated in every significant respect by Michner. The latter individual is neither a citizen nor a resident of the United States and, so far as we know, has no interest in the outcome of the case. In fact, there is no indication on the record that he has had any contact with the petitioners for a number of years prior to his appearance. Having had the opportunity of observing Michner as a witness, we are of the opinion that his testimony was entirely credible, including his account of the establishment of United, *228 S.A., the interest of Carlos Serano, and the efforts to disguise the true ownership. We also note that nowhere in this record is there any evidence of unexplained increases in net worth, or of living scales incompatible with reported incomes, or of hidden assets, or, indeed, any concrete indications whatsoever that the true taxable incomes of the various petitioners were anything but what they did in fact report. As we have found, the petitioners did in fact report rather substantial salary payments from United, S.A. The findings of fact with respect to the lumber exporting business control the disposition of the fraud issue, since no additional unreported income was found by the respondent with respect to the years in question. Petitioners concede liability for the additions to tax pursuant to section 294(d)(1)(A) for failure to file an estimated income tax return, but deny liability for the additions to the tax pursuant to section 294(d)(2) for substantial underestimation of the estimated tax on the grounds that the section 294(d)(2) addition is an alternative tax and will not apply where no estimated tax return has been filed. They cite *229 (N.D. Ga., 1954). This Court has held to the contrary in , affd. on this issue, (C.A. 5, 1958); , modified ; and , affd. on other grounds, (C.A. 10, 1954). We know of no reason to alter that rule here. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: ESTATE OF BAYNE F. MITCHELL, deceased, ELIZABETH A. MITCHELL, Executrix, and ELIZABETH A. MITCHELL, individually, Docket No. 48898; ESTATE OF BAYNE F. MITCHELL (Deceased) ELIZABETH A. MITCHELL, Executrix, Docket No. 48899; BENJAMIN DUVAL DONALDSON and ADA FRANCES DONALDSON, Docket No. 61538.↩
2. All section references are to the Internal Revenue Code of 1939.↩
3. So spelled in the record but the reference is probably to Manzanillo in the State of Colimo.↩